IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| FED CETERA, LLC, | : |
| Plaintiff, | : Case No. 17-cv-02809 (RBK/AMD) |
| v. | : **OPINION** |
| NATIONAL CREDIT SERVICES, INC., | : |
| Defendant. | : |

**KUGLER**, United States District Judge:

Before the Court are cross-motions for summary judgment filed by Plaintiff Fed Cetera, LLC (ECF No. 52) and Defendant National Credit Services, Inc. (ECF No. 53). On October 13, 2021, we granted Defendant's motion for summary judgment and denied as moot Plaintiff's motion for summary judgment. (ECF Nos. 70, 71). Plaintiff appealed to the Third Circuit, and the Third Circuit reversed and remanded for further proceedings on the motions. (ECF No. 75); *Fed Cetera LLC v. Nat'l Credit Servs., Inc.*, No. 21-3037, 2022 WL 4481538 (3d Cir. Sept. 27, 2022). We ordered supplemental briefing in light of the Third Circuit's decision. (ECF No. 77). We now reconsider the parties' motions for summary judgment, taking into consideration the original motion briefs (ECF Nos. 52–54, 60–62, 66–67) and the parties' supplemental briefs (ECF Nos. 78–79). For the reasons expressed below, both motions are denied.

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This dispute arises from a "Subcontracting Finder's Agreement" (the "Agreement") between a debt collection business, National Credit Services, LLC ("NCS"), and a "matchmaking"

company, Fed Cetera.[1] Fed Cetera is a "specialty business" that introduces small debt collection companies to federal student debt collection direct contractors for the purpose of facilitating student debt collection subcontracts. (ECF No. 52 ("Pl. Br.") at 2). Fed Cetera is co-owned by Nicolas Bernardo and Leah Wilson Conger. (ECF No. 60-1 ¶ 7). Haidari Sarajy is the president and sole owner of NCS. (ECF No. 53 ("Def. Br.") at 3; ECF No. 61 at 2).

In 2009, NCS entered the student loan servicing business and sought to obtain a contract with the Department of Education ("ED") to service federal student loan contracts, though it had not yet performed the servicing of federal student loans. (Def. Br. at 4; Pl. Br. at 6). The process of winning a student debt collection contract with the federal government is a "convoluted but—within the industry—well-known path." *Fed Cetera LLC v. Nat'l Credit Servs.*, 938 F.3d 446, 468 (3d Cir. 2019). As Fed Cetera explains, "[t]he contracting scheme of [ED] is in two tiers. ED contracts directly with several contractors. Those direct contractors then enter subcontracts for some of the work." (Pl. Br. at 2). If a company wishes to obtain a direct student debt collection contract with ED, "[t]he company must begin by working as a subcontractor to a current federal contractor. If that subcontract goes well, then the company may have an opportunity to receive a direct federal contract the next time around." *Fed Cetera*, 938 F.3d at 468. Thus, to obtain a direct contract to service student loan debt for the federal government, NCS first needed to perform as a subcontractor for a current direct federal contractor.

On February 1, 2010, NCS and Fed Cetera entered into the Agreement with the purpose of facilitating student loan subcontracts for the benefit of NCS. (ECF No. 1 ("Compl.") Ex. A ("Agreement")). Mr. Sarajy read the Agreement but did not ask NCS's attorney to review the

---

[1] The original parties to the Agreement were NCS and Net Gain Marketing, Inc. On January 1, 2013, Net Gain assigned its rights under the Agreement to Fed Cetera. For ease of reading, we refer to Plaintiff as Fed Cetera throughout this opinion.

2

Agreement before signing it. (Pl. Br. at 7) (citing 52-4 at 17 *et seq.*, Sarajy Deposition at 27:17–21). According to Fed Cetera, "[t]he only questions asked by Mr. Sarajy . . . before signing were how long the contract was and what was the fee" for Fed Cetera's services. (*Id.*).

Under the Agreement, NCS engaged Fed Cetera for a term of five years as a consultant "to the exclusion of any other consultant." (Agreement ¶ 1). Fed Cetera agreed to "introduce [NCS] to debt collection agencies for which there is an opportunity" for NCS to enter a subcontracting or "teaming"[2] transaction and to "assist[] otherwise with the negotiations between the parties." (*Id.* ¶ 2). In exchange, NCS agreed not to "solicit Federal contractors for purposes of establishing a subcontracting or teaming relationship" on its own and agreed to refer all solicitations to Fed Cetera during the Agreement term. (*Id.* ¶ 1). For every contract NCS obtained during the Agreement term, NCS agreed to pay Fed Cetera a "finder's fee":

> **Compensation.** If at any time during the term of this agreement, or one year thereafter (the "Applicable Period"), any Fee Transaction (as hereinafter defined) is consummated by [NCS]. . ., then [NCS] shall pay to [Fed Cetera] . . . a finder's fee (the "Fee") in the amount of two and one-half percent (2.5%) . . . .

(*Id.* ¶ 5). The Agreement defines "fee transaction" in two parts. First, the term "fee transaction" "means the consummation, with any Federal contractor, of any transaction related to 'teaming' or 'subcontracting' as those terms are commonly understood in Federal contracting . . . ." (*Id.*). Second, the term "fee transaction" "also means" the

> subsequent consummation of any contract with any Federal government agency for which [NCS] has been invited to compete, and is later awarded a contract to perform, which both parties herein expressly agree shall have arisen due to any "teaming" or "subcontracting" engagement Finder may have facilitated in advance of any such award of a contract by a Federal government agency.

---

[2] "In [Department of Education] collection parlance, a subcontractor and/or 'teaming' partner is one which contracts with a Private Collection Agency (PCA); a PCA being a direct contractor to United States government agencies." (Pl. Br. at 2 n.1).

(*Id.*). Because the Agreement was entered on February 1, 2010, and the applicable period under the Compensation clause is a total of six years, it is undisputed that the finder's fee obligation is triggered only by transactions consummated on or before February 1, 2016. (ECF No. 53-2 ¶ 35; ECF No. 60-1 ¶ 35).

Fed Cetera subsequently introduced NCS to Account Control Technology (ACT), a PCA servicing student loans for ED. (Def. Br. at 10). Fed Cetera facilitated the relationship by sending emails to ACT regarding NCS and helping to arrange meetings or phone calls between ACT and NCS around May 2010. (ECF No. 53-2 ¶¶ 39–40). ACT selected NCS as its subcontractor in June 2010, and ACT and NCS entered into a contract around August 2010. (Def. Br. at 10; Pl. Br. at 8). Fed Cetera assisted the negotiation process by reviewing the draft agreement between NCS and ACT and offering revisions. (Def. Br. at 10). NCS began performing under the ACT subcontracting agreement in early 2011. (*Id.*). NCS has been paying Fed Cetera a fee for this introduction, in accordance with the terms of the Agreement. (*Id.* at 8). It is undisputed that this is the only relationship Fed Cetera facilitated on behalf of NCS under the Agreement. (ECF No. 53-2 ¶ 36; ECF No. 60-1 ¶ 36).

In 2013, ED published an open solicitation to contract directly with it as a PCA for collecting student loan debts. (Compl. ¶ 15; Def. Br. at 11). NCS prepared a bid for the contract, although Fed Cetera did not assist NCS in the process.[3] (Def. Br. at 11; ECF No. 60-1 ¶ 49). On September 30, 2014, NCS received a solicitation award (the "ED solicitation") and Mr. Sarajy, on behalf of NCS, signed a document detailing the award and its terms. (ECF No. 53, Ex. 6 ("ED

---

[3] The record is unclear as to whether NCS sought assistance from Fed Cetera on its bid for the ED contract. In its brief in support of its motion, NCS states, "NCS did not seek any help from Fed Cetera in preparing its bid for ED, and Fed Cetera never offered any." (Def. Br. at 11). Yet in its brief in opposition to Fed Cetera's motion, NCS states, "NCS asked Fed Cetera for help preparing its bid, but Fed Cetera refused unless NCS agreed to pay more money." (ECF No. 61 at 6) (citing Mr. Sarajy's deposition). Fed Cetera states that it did not know of the bid until the ED award was publicly announced. (ECF No. 60-1 ¶ 49; Pl. Br. at 8; *see also* ECF No. 61 at 7). Whether NCS sought assistance from Fed Cetera or not, it is undisputed that Fed Cetera played no role in the bid.

4

Solicitation") at 1; ECF No 60-1 ¶ 51). On February 27, 2015, NCS issued a press release announcing that "NCS's strong performance on the 2009 [ACT] subcontract ultimately secured their award of the 2014 [ED] small business contract." (Pl. Br. at 8).

The terms of the ED solicitation required NCS to meet certain preparatory requirements before it would receive its "Authority to Operate" and begin receiving task orders. (ECF No. 53-2 ¶¶ 52–53; ECF No. 60-1 ¶¶ 52–53). Between September 2014 and July 2016, NCS worked to meet the prerequisites required under the ED solicitation. (Def. Br. at 12). On July 29, 2016, NCS received its Authority to Operate and began performing work for ED as a PCA in September 2016. (*Id.*). On January 23, 2017, Fed Cetera sent Mr. Sarajy a letter seeking payment of a finder's fee under the Agreement for NCS's performance of its ED contract. (ECF No. 52-4 at 109). The letter states: "NCS was invited to compete for a contract by ED in 2013 as a result of the publication of the Solicitation and ED's subsequent invitation to NCS and others to participate in Phase 2 . . . In accordance with the Contract and the dates above, your contract with ED is a Fee Transaction consummated during the term of the Contract." (*Id.*).

NCS declined Fed Cetera's request and Fed Cetera brought this action on April 25, 2017, seeking payment of a finder's fee for the ED contract. (*See* Compl.). On August 9, 2017, NCS moved for Judgment on the Pleadings, arguing that the ED contract was not "consummated" for purposes of triggering a finder's fee until performance began in September 2016, after the Agreement had expired. (ECF No. 14). We granted that motion, agreeing with NCS that a finder's fee is due only when a "fee transaction" is "consummated," i.e., when performance of the contract begins. (ECF No. 21 at 9). Because performance on the ED contract began after the six-year applicable period under the Agreement expired, we held that Fed Cetera was not entitled to fees for the ED contract and had failed to state a claim. (*Id.*). The Third Circuit reversed our decision

5

in *Fed Cetera*, 938 F.3d 466. Noting that the Agreement does not define the word "consummate," the court held a fee transaction "is consummated when it is formed, not when performance has begun." *Id.* at 472. This interpretation was supported by the duties of Fed Cetera under the Agreement, because Fed Cetera's "only function is to facilitate National Credit's successful formation of contracts." *Id.* at 472–73. Based on that function, reading "consummate" to require full completion of a successfully formed contract would lead to "absurd results":

> If the compensation provision were structured the way National Credit contends, Fed Cetera could lose out on a commission, to National Credit's gain, simply because of gamesmanship by National Credit or mere happenstance. If Fed Cetera helped National Credit negotiate and form a contract with a third party shortly before the end of the Agreement's term, for example, National Credit [could] avoid paying Fed Cetera . . . simply by delaying the start of its work for the third party, or because the third party is slow to delegate work to National Credit. Reading a contract to produce this sort of "absurd result" is disfavored.

*Id.* at 473. Because NCS had not shown the ED contract was formed after the end of the Agreement's term, the Third Circuit reversed and remanded for further proceedings.

Discovery followed, after which both parties moved for summary judgment. Our previous decision disposed of the motions solely on NCS's argument that the ED contract falls outside the scope of the Agreement because it did not "arise due to" a "'teaming' or 'subcontracting' agreement" that Fed Cetera facilitated. We read the Compensation clause to provide that, in order for Fed Cetera to collect a finder's fee on a direct contract that NCS secured with a federal agency, the direct contract must have been facilitated by Fed Cetera. We reasoned that in order to have "facilitated" the contract, Fed Cetera was required to put forth some effort relating to it. Because nothing in the record suggested that Fed Cetera did anything to facilitate the ED contract beyond securing an earlier subcontract with a direct federal contractor, we held that Fed Cetera had not "facilitated" the ED contract and was not entitled to a fee under the Agreement.

6

The Third Circuit again reversed our decision. *Fed Cetera LLC v. Nat'l Credit Servs., Inc.*, No. 21-3037, 2022 WL 4481538, at *3 (3d Cir. Sept. 27, 2022). The circuit court rejected our analysis of whether Fed Cetera had "facilitated" the ED contract because it "was not the proper inquiry." *Id.* at *2. Instead, "the inquiry should focus on whether the general federal contract has 'arisen due to' the previous subcontract facilitated by [Fed Cetera]." *Id.* The Third Circuit interpreted the two definitions of "fee transaction" in the Compensation clause "to provide that '[Fed Cetera] agreed to introduce National Credit to a federal contractor' in the hopes of securing a subcontract with that contractor. . . . 'That subcontract,' in turn 'could ultimately lead National Credit to win a direct federal contract of its own.' . . . In such a case, 'National Credit would owe [Fed Cetera] a 2.5% finder's fee for both contracts.'" *Id.* at *2 (internal citations omitted). The Third Circuit declined to decide on its own whether the ED contract arose "due to" the ACT subcontract and remanded with directions to "more fully consider" that question. *Id.* In addition, the Third Circuit directed our attention to a potential ambiguity in the Agreement, which states that "both parties herein expressly agree" a general contract "shall have arisen" due to the subcontracting. *Id.* at *2 n.2. The court noted that "[t]he use of multiple tenses in the clause is understandably confusing, and the parties offer differing interpretations of what this 'express agreement' means." *Id.* We now proceed to reconsider the motions for summary judgment in accordance with the Third Circuit's directives.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a

verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995).

"When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

The parties agree the interpretation of the Agreement is governed by New Jersey law. New Jersey courts "enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" *Manahawkin*

*Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (quoting *Caruso v. Ravenswood Developers, Inc.*, 337 N.J. Super. 499, 506 (App. Div. 2001)). In general, "contract terms should be given their plain and ordinary meaning." *Kernahan v. Home Warranty Admin. of Fla., Inc.*, 199 A.2d 766, 778 (N.J. 2019). However, "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement," even where the contract is facially unambiguous. *Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 301–02 (1953). "The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose." *Id.*; *see also Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 269 (2006). "It is only after the meaning of the contract is discerned that the parol evidence rule comes into play to prohibit the introduction of extrinsic evidence to vary the terms of the contract." *Conway*, 187 N.J. at 270.

"The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." *Great Atlantic & Pacific Tea Co., Inc. v. Checchio*, 335 N.J. Super. 495, 502 (App. Div. 2000). Whether a contract is ambiguous is a question of law for the court to decide. *Nester v. O'Donnell,* 301 N.J. Super. 198, 210 (App. Div. 1997). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations[.]" *Id.* An ambiguity may be found "when in the context of the document itself and the transaction to which it pertains the terminology employed, despite a facile simplicity, actually is not free from doubt as to its meaning." *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 192 (App. Div. 2002). Where a contract's terms are found to be ambiguous, the parties will present

extrinsic evidence to a finder of fact to determine the meaning of the terms. *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 192 (App. Div. 2002).

Both parties argue that the definition of "fee transaction" under the Agreement is unambiguous, yet the parties present two opposing interpretations. To determine whether the Compensation clause is ambiguous, we must examine whether the second "fee transaction" definition is "susceptible to at least two reasonable alternative interpretations." *Nester,* 301 N.J. Super. at 210. Because we find that it is, we hold that the interpretation of that "doubtful provision should be left to the jury." *Great Atlantic*, 335 N.J. Super. at 502. In addition, we find that there is a genuine dispute of material fact as to whether NCS consummated the ED contract, such that the contract qualifies as a fee transaction, within the six-year applicable period under the Agreement. Because these two disputes of material fact exist, the parties are not entitled to judgment as a matter of law.

### A.  Whether the Definition of "Fee Transaction" is Ambiguous

Fed Cetera argues it is entitled to judgment as a matter of law because the ED contract is definitionally a "fee transaction." It is undisputed that the ED contract does not meet the first definition of a fee transaction, which includes only transactions "related to 'teaming' or subcontracting.'" (Agreement ¶ 5). Because the ED contract is a direct contract, the parties' point of dispute is whether it falls under the second definition of "fee transaction," which provides as follows:

> The term "Fee Transaction" also means the subsequent consummation of any contract with any Federal government agency for which the Principal [NCS] has been invited to compete, and later awarded a contract to perform, which both parties herein expressly agree shall have arisen due to the "teaming" or "subcontracting" engagement [Fed Cetera] may have facilitated in advance of any such award of a contract by a Federal government agency.

10

(*Id.*). Each party asserts that its proposed interpretation of this provision is correct and that the term is entirely unambiguous.[4]

Fed Cetera argues that, under the second definition, NCS and Fed Cetera "expressly agree[d]" that "the subsequent consummation of *any* contract with any Federal government agency for which [NCS] has been invited to compete, and later awarded a contract to perform . . . *shall have arisen due to* the . . . 'subcontracting' engagement [Fed Cetera] . . . may have facilitated." Under this interpretation, any federal contract obtained by NCS after the ACT subcontracting engagement necessarily "arose due to" the subcontracting engagement, and therefore qualifies as a fee transaction. Because it is undisputed that the ED contract is a contract with a federal agency and was consummated after the ACT subcontract, the ED contract necessarily arose due to the ACT subcontract. Therefore, Fed Cetera argues, it is entitled to judgment as a matter of law because the ED contract is a "fee transaction."

Fed Cetera's interpretation of the express terms of the contract finds some support from evidence in the record of "the intent of the parties, . . . surrounding circumstances and the underlying purpose of the contract.'" *Manahawkin Convalescent*, 217 N.J. at 118. Because a student loan servicing company must first perform a subcontract before the government will consider the company for a direct contract, it is logical that the ED contract necessarily "arose due to" any student loan subcontract facilitated by Fed Cetera. NCS could not have obtained a direct contract without first performing a subcontract. In this context, it is reasonable that the parties may have "expressly agree[d]" that any direct contract necessarily "arose due to" Fed Cetera's facilitation of a subcontract.

---

[4] NCS also argues in the alternative that the second definition of "fee transaction" is ambiguous and should be construed, as a matter of law, against Fed Cetera as the drafter of the agreement. However, under New Jersey law, an ambiguity in a contract's terms is a question for a fact finder. *Great Atlantic*, 335 N.J. Super. at 502. If there is an ambiguity, we are not permitted to resolve it as a matter of law.

11

However, NCS argues there are several flaws in Fed Cetera's interpretation. First, NCS points out that Fed Cetera's interpretation renders the entire "arisen due to" clause superfluous. If the clause's only function is to state that any federal contract necessarily arose due to Fed Cetera's facilitation of a subcontract, then the second definition could have simply stated that Fed Cetera is owed a finder's fee upon the consummation of any transaction with any federal agency within the applicable period. "[C]ontract provisions are to be interpreted so as to give each provision meaning, rather than rendering some provisions superfluous." *Carter v. Exxon Co. USA*, 177 F.3d 197, 206 (3d Cir. 1999).

Second, NCS argues Fed Cetera's proposed reading of the "fee transaction" definition "would lead to absurd results." (Def. Br. at 8). Mr. Bernardo acknowledged in his deposition that, under Fed Cetera's proposed reading of the definition of "fee transaction," Fed Cetera would be entitled to a finder's fee for *any* federal contract obtained by NCS, regardless of whether it is related to a subcontract facilitated by Fed Cetera:

> Q. So this applies to any contract with any federal government agency, correct?
>
> A. As written, yes.
>
> Q. Yes. So, as written, if NCS got a contract with the Department of Defense for building satellites, you would contend that they owe you money, correct?
>
> A. Conceivably, yes.

(Def. Br. at 9) (quoting Bernardo Dep. at 155:14 – 158:7). Thus, although it is undisputed that the parties contemplated only subcontracts and/or direct contracts related to student loan debt servicing when the Agreement was drafted and executed, Fed Cetera's interpretation would entitle it to fees for contracts obtained far outside that scope and with absolutely no causal connection to Fed Cetera's performance under the Agreement. "Reading a contract to produce this sort of 'absurd result' is disfavored." *Fed Cetera*, 938 F.3d at 473.

NCS urges us to read the Compensation clause in light of the context and circumstances of the Agreement, including that the Agreement "does not provide for any services by Fed Cetera . . . related to direct, or 'primary' contracts." (Def. Br. at 1). NCS argues the plain language of the Agreement "clearly reflects the intent of the parties to enter an agreement to facilitate a subcontracting and/or teaming arrangement, and not a primary contract" with ED. (*Id.* at 16). First, the Agreement is titled "Subcontracting/Teaming T&S Agreement." (*Id.* at 6). Second, the Agreement "only obligates Fed Cetera to help NCS with subcontracting and/or teaming" and Fed Cetera is not required "to do anything with regard to a primary contract between NCS and ED." (*Id.* at 15). The narrow scope of duties the Agreement imposes on Fed Cetera demonstrates that "the parties contemplated only one benefit: a subcontract or teaming agreement." (*Id.* at 6). These circumstances support NCS's argument that Fed Cetera is not necessarily entitled to a finder's fee for any direct contract NCS consummates with a federal agency, and therefore Fed Cetera's interpretation is unreasonable.

NCS urges us to find that the second definition of "fee transaction," "at most, means that the parties could later agree to expand their finder's relationship to include primary contracting." (Def. Br. at 7). NCS argues the provision that "the parties herein expressly agree" "require[s] a subsequent agreement by the parties that a particular primary contract between NCS and a federal agency 'arose due to' a prior subcontract facilitated by Fed Cetera before such a primary contract would be encompassed within the definition of 'Fee Transaction.'" (ECF No. 79 ("Def. Supp. Br.") at 2). NCS's proposed interpretation makes sense if the word "herein" modifies "parties" rather than "expressly agree." It is unclear which word "herein" is intended to modify, and therefore the function of "herein" in the "arisen due to" clause presents an ambiguity in the second definition of fee transaction.

13

The parties have proposed two plausible interpretations for the second definition of fee transaction. We note that other interpretations beyond the two offered by the parties may be plausible as well. Ultimately, the definition is poorly drafted and cannot be construed based solely on its "plain and ordinary meaning," because the language is not plain or ordinary at all. *See Kernahan*, 199 A.2d at 778. The term uses multiple tenses, contains several words that are not defined in the Agreement, and lacks a clear function within the Compensation clause. We find the second "fee transaction" definition is "susceptible to at least two reasonable alternative interpretations." *Nester,* 301 N.J. Super. at 210. Therefore, the interpretation of that "doubtful provision should be left to the jury." *Great Atlantic*, 335 N.J. Super. at 502. Fed Cetera is not entitled to judgment as a matter of law and its motion will be denied.

**B.     Whether the ED Contract was "Consummated" within the Applicable Period**

NCS argues it is entitled to summary judgment because there is no genuine dispute that the ED contract at issue was consummated after the "Applicable Period" of the Agreement. (Def. Br. at 22). The question of "consummation" under the Agreement is a question of when the fee transaction was formed: "The only question here is when, under the terms of the Agreement, National Credit's second contract was 'consummated.' The Agreement's applicable period lasted until February 2016. If the federal contract was consummated before that date, then National Credit owes a finder's fee. If it was consummated after, then National Credit does not." *Fed Cetera*, 938 F.3d at 470. Thus, the issue before us is whether there is a genuine dispute of material fact as to whether a contract between NCS and ED formed before February 2016. Fed Cetera argues the contract formed when NCS received the ED solicitation award on September 30, 2014. NCS argues the ED solicitation award did not constitute a contract because it did not impose legal

obligations. (Def. Br. at 23). NCS maintains that no legally enforceable contract existed until, at the earliest, July 29, 2016, when it received clearance to receive work from ED. (*Id.* at 22).

Under New Jersey law, a contract is "consummated" or formed upon offer and acceptance of the terms of an agreement:

> [A] contract does not come into being unless there be a manifestation of mutual assent by the parties to the same terms . . . .There must needs be an agreement—a 'meeting of the minds' on the subject matter, to use a classic time-honored term, or there is no legally enforceable obligation. An expression of assent that modifies the substance of the tender, while it may be operative as a counter-offer, is yet not an acceptance and does not consummate a contract. In the very nature of the contract, *acceptance must be absolute*."

*Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526, 538 (1953); *see also Fed Cetera*, 938 F.3d at 11 n.2 (citing *Johnson & Johnson*). "A contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty." *Restatement (Second) of Contracts* § 1.

It is undisputed that NCS was awarded an ED solicitation on September 30, 2014. (Def. Br., Ex. 6 ("ED Solicitation") at 1). The solicitation is labelled, on its cover sheet, "Solicitation/Contract/Order for Commercial Items." (*Id.* at 1). It is identified as contract number ED-FSA-14-D-0018, and the cover sheet states that the "Award/Effective Date" is September 30, 2014. (*Id.*). It instructs that "Offeror [is] to Complete" specified blocks on the form. (*Id.*). Mr. Sarajy's signature, as President of NCS, is affixed to the coversheet in a box labelled "Signature of Offeror/Contractor." (*Id.*). His signature indicates his agreement to the following statement: "Contractor is required to sign this document and return copies to issuing office. Contractor agrees to furnish and deliver all items set forth or otherwise identified above and on any additional sheets subject to the terms and conditions specified." (*Id.*). Some of this language supports Fed Cetera's position that the solicitation was a binding contract: it is labelled with a "contract number," it contains an "effective date," and it is signed by Mr. Sarajy as President of NCS. Some of it,

15

however, supports NCS's position that the solicitation is merely a presentation of the estimated terms of a future contract, and that the document was not binding on the parties on September 30, 2014. The instructions that "Offeror [is] to Complete" the blocks in the form support a finding that the form is part of a process under which NCS presented an offer to ED, but that ED had not yet assented to the terms offered by NCS.

Furthermore, NCS argues that the solicitation award is not a contract because it does not impose legal obligations on the parties. Instead, it "is the equivalent of a 'Letter of Intent' in the private context. It expresses interest to later enter a formal contract, sets out the anticipated terms and conditions, and details a substantial due diligence period. Like a letter of intent, the ED Solicitation imposes no obligation on the parties to actually proceed with execution of a binding contract." (Def. Br. at 25). Certain portions of the solicitation provide support for NCS's position. For example, the solicitation states that ED "may at any time, by written order, and without notice to the sureties, if any, make changes" to the "description of services to be performed," the "time of performance" and the "place of performance." (*Id.* at 11). This language indicates that there was not "mutual assent" to or "absolute acceptance" of the terms, because ED reserved the right to change the terms at will. Further, the solicitation provides that it "is an indefinite-quantity contract for the supplies or services specified. . . . The quantities of supplies and services specified in the Schedule are estimates only *and are not purchased by this contract*." (*Id.* at 18) (emphasis added). NCS states that it did not enter into a binding contract with ED until it received task orders, which occurred "long after February 2016, when the payment term of the T&S Agreement expired." (*Id.*). Unlike the solicitation, NCS argues the task orders "are a contract: they impose obligations on NCS to service the loans and obligations on ED to pay for such servicing." (*Id.*). A reasonable jury could find, based on these facts, that the ED solicitation does not constitute a contract.

Fed Cetera argues that NCS's position is "barred by its judicial admission that a 'contract' or 'agreement' existed between NCS and ED in September 2014." "Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 470 n.6 (2013). Fed Cetera cites NCS's Answer to the Complaint, in which NCS stated "that it signed the NCS/ED *Agreement* on September 30, 2014." (ECF No. 62 at 17) (citing ECF No. 52-4 at 5). NCS also stated in its Answer that it "admits that its *contract* with ED is number ED-FSA-14-D-0018." (*Id.*) (citing ECF No. 52-4 at 6). However, whether a contract exists is not a "factual assertion" but rather a question of law. Furthermore, NCS has consistently argued throughout this litigation that the ED solicitation was not binding, and therefore was not a contract under the law. (*See, e.g.*, ECF No. 17 at 4) ("There is no allegation in Fed Cetera's Complaint that ED even became obligated to provide work to NCS by signing an agreement in September 2014."). NCS is not barred from maintaining its position that the ED solicitation is not a legally enforceable contract merely because NCS referred to it at some point in these proceedings as a "contract," a word which carries both legal and colloquial meanings.

Fed Cetera further argues the solicitation satisfies the definition of a contract because "NCS had an expectation in 2014 that if it fulfilled its continuing promises, it would receive task orders from ED. NCS did receive task orders. NCS would not have received the task orders without contract ED-FSA-D-0018 dated September 30, 2014." (ECF No. 62 at 19). Fed Cetera further points out that the ED solicitation contains a minimum purchase requirement. (*See* ED Solicitation § B.4, at p. 7–8). Section B.4 of the ED solicitation states: "The IDIQ [indefinite delivery/indefinite quantity] minimum is expected to be $1,000.00. The total estimated IDIQ contract maximum ceiling is $2,000,000,000.00. The estimated quantities will be identified before the contract award."

17

(*Id.*) (emphasis added). This portion of the solicitation could lead a jury to find the solicitation constitutes mutual assent to bind ED to make a minimum purchase. If it constitutes binding mutual assent, then the solicitation constitutes a contract. However, a jury could also find that Section B.4 does not constitute mutual assent to binding terms, but merely stated *expected* minimums and binding minimums would "be identified before the contract award."

A reasonable jury could find that the ED solicitation is a "contract" that was "consummated" on September 30, 2014, within the applicable period of the Agreement. However, a reasonable jury could also find the ED solicitation was not a contract and that no contract between ED and NCS was consummated until after the end of the applicable period of the Agreement. A genuine dispute of material fact exists as to when a contract with ED was consummated and therefore, NCS is not entitled to summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Fed Cetera's motion for summary judgment is **DENIED** and NCS's motion for summary judgment is **DENIED**. An Order follows.

Dated: 8/16/2023               s/ Robert B. Kugler
                               ROBERT B. KUGLER
                               United State District Judge